### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHRISTINA VACCARO<br>P.O. Box 181<br>Ashton, MD 20861<br><br>Plaintiff,<br><br>v.<br><br>THE JOHNS HOPKINS HEALTH SYSTEM<br>CORPORATION,<br>8600 Old Georgetown Road,<br>Bethesda, MD 20814<br>Defendant.<br><br>c/o Its Resident Agent:<br><br>CSC-Lawyers Incorporating Service Company<br>7 St. Paul Street, Suite 820<br>Baltimore MD 21202 | *<br>*<br>*<br>*<br>*  CASE NUMBER: _____<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* |

### COMPLAINT

NOW COMES, Plaintiff, Christina Vaccaro ("Plaintiff"), by and through her attorneys, Paul V. Bennett, Esq., and Bennett Legal Services, Inc., and hereby sues Defendant, The Johns Hopkins Health System Corporation ("Defendant" or "Hopkins") and states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101, *et seq.* ("ADA")*;* Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, *et seq.*; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §621, *et seq.*; Annotated Code of Maryland Code, State Government Article §20-606; Annotated Code of Maryland, State Government

Article, §20-601, *et seq*. ("FEPA"); the Rehabilitation Act of 1973, Section 504 of the

Rehabilitation Act of 1973, ("Rehab Act"), 29 U.S.C. §794 *et seq*.; and Annotated Code of

Maryland Code, State Government Article §20-602.

2.      Venue is proper because all or most of the acts that gave rise to this action

occurred in Maryland.

**PLAINTIFF'S EXHAUSTION OF ADMINISTRATIVE REMEDIES**

3.      On September 25, 2024, Plaintiff timely contacted the Maryland Commission on

Civil Rights ("MCCR") MCCR cross-filed the Charge for race discrimination, disability

discrimination and retaliation with the U.S. Equal Employment Opportunity Commission

("EEOC").

4.      On October 1, 2024, Plaintiff amended her charge to add age discrimination and

amended again on March 28, 2025, adding wrongful termination.

5.      On November 18, 2025, Plaintiff received a Notice of Right to Sue from the

EEOC, therefore, Plaintiff has exhausted her administrative remedies before timely filing suit.

**FACTS COMMON TO ALL COUNTS**

6       Plaintiff, Christina Vaccaro is a Caucasian individual, over age 40 (year of birth

1967), with the disability of asthma who at all relevant times was an employee of Defendant.

7       Defendant, The Johns Hopkins Health System Corporation is a private, nonstock

corporation, employing five-hundred (500) or more persons, and is an "employer" within the

meaning of Title VII and of FEPA.

8       At all relevant times, Defendant was Plaintiff's employer and conducted business

in Maryland.

9.      Plaintiff's disability of asthma, from time-to-time substantially limits her ability to perform certain major life activities, of which Defendant was notified.  Plaintiff requested as a reasonable accommodation that she be allowed to wear an N-95 3M Aura 1870 Covid-19 mask.

10.     Plaintiff was one of the only Caucasians and one of oldest LPNs in her unit.

11.     Defendant was aware at all times herein of Plaintiff's race, age, disability and requested reasonable accommodation.

12.     Plaintiff began her employment with Hopkins on or about June 26, 2023, as a Licensed Practical Nurse ("LPN"). Plaintiff's immediate supervisor was Charlene Faku, Director of Nursing (African-American, under 40, upon information and belief not disabled, hereinafter "Ms. Faku").  Plaintiff's work performance was excellent.

13.     Plaintiff earned a wage of $42.47 per hour during her tenure with Defendant. Additionally, she received differentials on top of her hourly pay rate.[1]

14.     On September 4, 2023, Plaintiff was injured by a combative patient whose care she shared with Registered Nurse ("RN") Kama L/N/U (African American, "Kama"), Plaintiff's preceptor that day.  Plaintiff's injury was to her left shoulder and wrist.  Kama also sustained injury to both wrists.

15.     Plaintiff filed a Workers Compensation  ("WC") claim after this September 4, 2023, injury, shortly thereafter, in September 2023.

16.     From on or about June 26, 2023, to on or about March 4, 2025, the Respondent's management team and Hopkins Human Resources Department ("HR") continuously subjected

---

[1]    Starting at 3:00 p.m. daily evening differentials, in other words, more pay added. Plaintiff also received extra pay for working on weekends.  Plaintiff no longer has access to the exact amounts but to the best of her recollection at this time, she believes it was approximately $1.00 or $2.00 per hour extra in the evenings and then an extra $2.00 or $3.00 for weekends in addition.

Plaintiff to racial, age-related, disability-related, and retaliatory harassment and disparate treatment.

17.    Examples of race discrimination include but are not limited to:

a.    Ms. Faku allowed RN Kama to work with bilateral wrist injuries sustained at the same time as Plaintiff's September 4, 2023, injury from a patient, when Ms. Faku would not allow Plaintiff to work under the same conditions with her wrist injury.

b.    On or about May 3, 2024, Kama just walked into Ms. Faku's office and they talked for a long period of time.  Conversely, Plaintiff had requested several times to speak with Ms. Faku and was told "I'm busy, I'll get back to you." She never did get back to Plaintiff and she didn't likewise advise Kama she was too busy.

18.    Examples of age discrimination include but are not limited to:

a.    Victoria Hoyos, an RN (upon information and belief in her mid-20's, "Ms. Hoyos") on or about July 2023, was overheard by Plaintiff, talking to Ms. Faku about her (Plaintiff), neither knew that Plaintiff was within hearing distance. Plaintiff was waiting for Ms. Hoyos and at first, couldn't find her.  Plaintiff needed Ms. Hoyos to with her into a patient's room.  As Plaintiff approached near the nurse station, Ms. Hoyos said to Ms. Faku, "Christina is too old to be doing this job, she can't keep up with me on the floor.  I feel like she's an anchor weighing me down, and I move quickly.  Can you put her with someone else?"  Ms. Faku replied, "yeah, I think she's like 50ish, or something. She already came to me wanting me to assign her to someone else because you won't let her do anything"  Plaintiff had already complained to Ms. Faku several times and requested a new preceptor because Ms. Hoyos would not allow Plaintiff to do much of

anything, just follow her around all day.  Plaintiff felt that Ms. Hoyos was fast, but simply erratic and the fact is that Ms. Hoyos got fired later.

   b. In conversation with Kama, Plaintiff learned that one reason she (Kama) kept working with injuries was 'because Hopkins wants these young nurses, hospitalists, and techs, it's what they're hiring now'.

   c. Educator Jennifer Moreland (early 30s, pregnant during the time Plaintiff was employed by Hopkins, "Ms. Moreland") allowed a new RN (approximately early 20s, Hispanic, name unknown at this time) who had never learned IV's or blood draws in school but was allowed to work with people and in IV therapy class.  This 20-something RN told Plaintiff that Ms. Moreland sent her (to work with people and to the IV therapy class). She also told Plaintiff that others got to go work on floor with surgery to gain IV experience. Ms. Moreland would never allow Plaintiff to do any of that, in spite of her many requests, nor would Ms. Faku.

19. Regarding disability discrimination, in or around June 2023 in an Occupational Health ("OH") visit prior to starting on unit at that same approximate time, Plaintiff advised OH of her need to an N-95 3M Aura 1870 Covid-19 mask, showing the mask to the OH nurse (name unknown, age approximately late 30's, no known disability).  That OH nurse advised Plaintiff that it was Ms. Faku's responsibility to order Plaintiff's masks, and to continue ordering the masks as necessary and that Plaintiff did not have to pay to supply them.

20. Plaintiff however, had to use her own mask that she had purchased, for months. She continuously asked Ms. Faku, in person and by email specifically requesting that Ms. Faku order them but Plaintiff's requests were ignored.  She went to Ms. Faku on several occasions and on one of those occasions, Ms. Faku said:  "I have no idea what Occupational Health is talking

about, why would I order them?"  Plaintiff continued to ask Ms. Faku to please get in touch with

OH as that's what they had told Plaintiff before she ever started on the unit.  Plaintiff also

advised Ms. Faku that she could not afford to pay for her own N-95 3M Aura 1870 Covid-19

masks.

21.    From approximately June through July 2023, Plaintiff went to Ms. Moreland

because Ms. Faku would not meet with her regarding the needed mask.

22.    However, upon information and belief, nobody at the Defendant's location ever

started working on this until after Plaintiff returned from an injury.

23.    The September 4, 2023, left shoulder and wrist injuries sustained by Plaintiff

caused her to be out on Workers Compensation from approximately September 2023 to May

2024.  Plaintiff's doctor advised that she should have remained out on WC longer but Hopkins

released to return to work in spite what both she and her doctor had told them.

24.    In late March or early April of 2024, Dr. Ryan Zimmerman ("Dr. Zimmerman"),

Johns Hopkins Independent Medical Examiner evaluated Plaintiff's WC-related injuries.

25.    After Dr. Zimmerman's report came back, in or around early to mid-April of

2024, Hopkins assigned Plaintiff to Kelly Barben ("Ms. Barben").  Ms. Barben worked for a

company called Leidos.  Plaintiff's understanding of that business relationship is that Hopkins

used that company to have their case managers take WC cases rather than utilizing Hopkins'

employees to serve in that capacity.

26.    As her WC case manager, Ms. Barben would make sure that Plaintiff's visits to

doctors and for physical therapy were authorized, and where appropriate, would make sure

Plaintiff got her medications.  Ms. Barben acted as the bridge between WC and Plaintiff.  In

other words, Plaintiff did not directly deal with WC but with Ms. Barben.

27.     On or about April 17, 2024, Plaintiff was notified by email from Ms. Barben that Plaintiff's pay would be cut off as would any ongoing treatment. In other words, her WC was being cut off and she would no longer be eligible to receive physical therapy supported by WC. No specific reason was provided for the cut-off, nor was there any advance notification. She was simply advised that Hopkins' Dr. Zimmerman, contrary to her own medical providers, had cleared her to return to work.

28.     In or around April 2024 Plaintiff made an appointment with Hopkins OH as she felt that she had no choice but to return to work.

29.     On or about April 5, 2024, she went to OH, where she was seen by Benjamin Kim, a Physician's Assistant (mid 30's, Asian, no known disability, "Mr. Kim"). OH appeared to have no standard by which to clear a return-to-work. It was a basic examination room; there weren't any weights for testing how much a person could lift or carry. There appeared to be no organization. Mr. Kim just picked random things for Plaintiff to lift, and made her lift a 50-pound water bottle. He had told her that her job description stated that she had to be able to lift 50 pounds. However, Plaintiff learned later than Hopkins no longer had that job requirement.

30.     Lifting that bottle hurt Plaintiff's right shoulder, bilateral shoulder pain (also into her left shoulder, her right shoulder felt a burning sensation, she had limited range of motion, paresthesia in her right bicep and right armpit, tingling in fingers (Plaintiff is right hand dominant). Plaintiff kept going with that appointment in order to be able to return to work because her WC was to end. But she felt pain right away and it got much worse when she left that OH appointment. After Mr. Kim made Plaintiff lift the water bottle, he had her lift the vital signs machine which weighs approximately 10 pounds. After which he looked around the room, telling her that he was looking for something else for her to lift.

31.     When Plaintiff lifted the bottle, and felt the pain, she told Mr. Kim.  His reaction was to make a snarky comment that everyone experiences pain.

32.      As described above in Paragraph 25, in early to mid-April of 2024, Plaintiff was officially cleared to return to work by Dr. Zimmerman.

33.     In spite of her clearance to return to work in April of 2024, Plaintiff didn't get back to work until May 1, because of Ms. Faku's delays such as demanding a zoom meeting before actually allowing Plaintiff to return to work.

34.     After Plaintiff had been working for approximately two weeks, she was injured by another patient on May 14, 2024, and sustained a torn rotator cuff injury to her right shoulder when patient became combative. Security was called twice but Plaintiff was already injured by the time they arrived.  This injury was such that Plaintiff has been advised to undergo surgery.

35.     After this May 2024, injury, a subsequent Workers Compensation claim was filed.

36.     Several times throughout both injuries several times, Plaintiff's doctor, Dr. Craig Miller requested that she be assigned the reasonable accommodation of light duty.  One such email request for the same was on November 11, 2024, and sent to case manager Ms. Barben. Plaintiff's reasonable accommodation request was also submitted to OH and HR.  The request came from Plaintiff's doctors:  Dr. Dan Pereles, Dr. Harrison Solomon, and Dr. Craig Miller.

37.     Hopkins, in the person of Ms. Faku, several times, denied the light duty request in or around November 2024.  Both for her first injury and for the second injury.  These several requests were made by multiple means:  fax, email and telephone.

38.     OH and HR could also have granted the reasonable accommodation request for light duty; Plaintiff had additionally been told by Mr. Kim (in OH) that there are always some light duty positions.

39.     Despite that, Defendant repeatedly refused to accommodate Plaintiff's doctors' requests for light duty (regarding both injuries).  In particular, Ms. Faku consistently ignored Plaintiff's emails and/or took unnecessarily long to reply to Plaintiff so much so that at least once, Plaintiff asked Mr. Kim (OH) if Ms. Faku was even still employed there.

40.     Plaintiff was subjected to arbitrary and unnecessary directives by Hopkins regarding what mask Plaintiff would be allowed to wear while at work.  Due to Plaintiff's disability-related health issues, Defendant was aware she is limited to wearing a specific type of mask.  However, Hopkins was consistently opposed to providing Plaintiff with her requested accommodation of wearing an N-95 3M Aura 1870 Covid-19 mask.

41.     Before Plaintiff started work at Defendant's location, she had met with OH and brought her mask with her.  She told OH that she could bring a letter from her asthma doctor, Dr. Wayne Meyer ("Dr. Meyer") if they needed that.  She told OH that she can only wear that type of mask due to her severe asthma.  Generally, all occupational health departments are to perform a "fit test" using a hood they place over one's head, filled with saccharin.  Plaintiff requested to not do this due to her already having a mask.

42.     The RN in OH told Plaintiff how she remembered those masks from usage during Covid-19.  Adding that it was not a problem to get those for her and that Plaintiff didn't need a disability form or anything special for that.

43.     Plaintiff asked her to please fill out reasonable accommodation form and put in her chart because she could not wear any other N-95s.

44.     That day the RN in OH also told Plaintiff that it was "Charlene Faku's responsibility to order masks" because she was Plaintiff's unit manager.

45.     Ms. Faku never ordered them even though Plaintiff regularly reminded her by going to her office, reminding her at the nurse's station, emailing, etc.

46.     This did not get handled until Plaintiff was out of work during her first injury. She had had to file several complaints about Defendant not providing the requested mask(s). Plaintiff was purchasing her own masks.

47.     Lori Katz, the secretary of OH, had to literally bring Plaintiff a mask to the unit so she could care for a Covid patient one day because Plaintiff had no protection and Ms. Faku still hadn't ordered them.

48.     Ms. Faku would just say that she had no idea what OH was talking about but she'd never done anything to clarify things in that regard.  None of this got handled until Plaintiff had filed multiple complaints.

49.     In or around May 2024, Plaintiff also complained to Jonathan Rojas of HR (approximately mid 30's, no known disability, "Mr. Rojas"); Mr. Kim (Physician's Assistant of OH); Ms. Faku's supervisor Eunice L/N/U (Hispanic, approximate age early to mid-30s, no known disability, "Eunice") and nurses in OH about the mask issue.

50.     The person in charge of the unit where Plaintiff worked was Josephine White (African-American, early to mid-40s, no known disability, "Ms. White").  Ms. White did get in touch with Plaintiff to schedule an in-person meeting with her in or around May 2024.  The meeting was rushed however, and she didn't seem to take anything seriously or just didn't allocate enough time.  Ms. White did tell Plaintiff that she would schedule a meeting for Plaintiff, Ms. Faku and herself.

51.     That May 2024 meeting was subsequently held, in-person in her HR office. At the meeting Ms. Faku was instructed to go back to the unit and meet with Plaintiff to go over the

numerous issues.  Namely, disparate treatment based on race, age, disability, workplace

harassment, bullying and retaliation issues. However, Ms. Faku did not comply with that

directive.

52.    Ms. Faku kept Plaintiff on probation through her entire time of employment from

June 26, 2023, through March 31, 2025.

53.    Ms. Faku told Plaintiff that she was keeping her on probation, telling her that she

was having performance issues even before she went on medical leave.

54.    Plaintiff filed complaints against Ms. Faku, in or around May 2024, and asked to

be transferred off Ms. Faku's unit as soon as possible.  But the decision to do so was up to Ms.

Faku and HR was no help at all.

55.    When Ms. Faku and Plaintiff met via Zoom, in or around early May 2024, she

advised she thought Plaintiff needed more precepting. Plaintiff told her since she had been out so

long she didn't mind a little but didn't think Ms. Faku meant that she was starting completely

over.

56.    Defendant's Independent Medical Examiner cleared her to return to work

prematurely in or around April 2024, after that initial 2023 injury.  This led to further physical

harm, necessitating that Plaintiff apply for Family Medical Leave Act time off ("FMLA") and

she further sought reasonable accommodations, such as light-duty work, but these requests were

either ignored or denied, which left Plaintiff working under strenuous conditions that worsened

her injuries.

57.    When Plaintiff returned to work from the September 2023, injury, in May 2024,

she was told by charge nurse that she had to work as a nurse technician for the day. When

Plaintiff asked why, she was directed to Ms. Faku.  When Ms. Faku arrived at work, Plaintiff

immediately went to her and requested that she allow her to perform her nursing duties, Ms. Faku refused.

58.    Plaintiff went to Ms. Faku's supervisor Eunice, on another hallway, Eunice refused to speak to Plaintiff or help in any way.

59.    Both Ms. White and Eunice told Plaintiff that they didn't get involved in that sort of issue and that it was up to Ms. Faku as to what she wanted Plaintiff to do.

60.    Plaintiff then, on May 16, 2024, went to HR and filed complaint/grievance.  She spoke with HR regarding other filed complaints and subsequently filed a full grievance with Mr. Rojas in HR. Tammy L/N/U, the HR secretary (approximately early 30's, no known disability, "Tammy") provided Plaintiff with a computer to use in the HR office and then she printed the grievances out for her.  In addition to Plaintiff's disability-related concerns, she reported racial and age-related discrimination and harassment.  She complained that there had been a marked pattern of preference for younger, non-Caucasian employees at Plaintiff's Hopkins location, in particular those employees were favored for certain tasks, positions, or privileges.

61.    That day, Plaintiff was wearing a doctor-ordered wrist brace. Plaintiff did work as a technician for the day and was not allowed to perform nursing duties.

62.    Later in May 2024, Ms. Faku refused to allow Plaintiff to wear a wrist brace while on duty, unless she filed for disability.  The brace was necessary due to the workplace injury that took place in September 2023, from which she suffered injury to her left hand that required Plaintiff to wear a wrist brace on that hand.  Plaintiff had to wear the brace to prevent her wrist from swelling but Ms. Faku refused to allow her to work while wearing it.

63.     When Plaintiff again raised these concerns with HR about discrimination, harassment and retaliation, instead of there being a discussion or resolution, Plaintiff was sent home that same day.

64.     HR provided no immediate responses to Plaintiff's reports of discrimination.  A meeting between the parties was promised.

65.     The meeting took place in or around May 2024, with Ms. White, Ms. Faku and Plaintiff.

66.     Plaintiff continued to be kept on probation after returning from the initial injury of September 2023.  Ms. Faku had Plaintiff restart her probation and then demoted Plaintiff to a nurse technician role.  Plaintiff's probationary status continued until Defendant terminated her employment in March of 2025.

67.     In spite of Plaintiff being told by Ms. Moreland, just before going out on medical leave for the September 2023 injury that she was doing great, she was never taken off probation.

68.     When Plaintiff returned to work, and Ms. Faku was continuing the probationary period and various others in her unit seemed to know everything about her situation and treated her disrespectfully, so much so that Plaintiff felt humiliated.

69.     While Plaintiff was on medical leave from the May 2024, injury, in or around February 2025, Plaintiff received a letter via Certified Mail stating that Defendant was not extending her medical leave but instead was terminating her from their employ.  The letter was from Ms. Faku with a courtesy copy to Ms. Tricia Parry ("Ms. Parry").  Ms. Parry is Senior HR Business Partner Human Resources National Capital Region.

70.     Plaintiff called Ms. Parry on upon receiving the Certified Mail letter and spoke with Ms. Parry advising her that she had been approved for medical leave through April 2025.

Ms. Parry said she would look into it, found that yes, Plaintiff had indeed been approved through April 2025 and to ignore that letter, that it was a mistake.

71.    Plaintiff called disability insurance company Sedgwick as they had approved her for a longer medical leave.  Defendant was opposed to this leave. Plaintiff reported that to Sedgwick, which resulted in her leave not being closed out.

72.    Approximately two weeks after the first letter was received, a second letter was received by Plaintiff, also via certified mail, which stated that Defendant was terminating her employment.  Plaintiff was still out on approved medical leave after being injured in May 2024. The letter stated that Plaintiff's termination date was March 4, 2025, that her benefits would end March 31, 2025, and the letter was from Ms. Faku.  The reason given for termination of Plaintiff's employment was that "… Hopkins could no longer continue to extend [your] leave of absence."  In that March 4, 2025, Hopkins cited her initial leave dates of Medical Leave of Absence as 09/07/2023 through 10/29/23 and that there had been multiple extensions thereof, up through 02/20/25.

73.    At all times relevant herein, Plaintiff met and/or exceeded Defendant's legitimate job expectations.

**COUNT I**
**DISCRIMINATION BASED ON RACE**
**(Disparate Treatment)**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, *et seq.***

74.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

75.    Plaintiff was qualified and satisfactorily performing her duties as a Licensed Practical Nurse ("LPN").

76.    Plaintiff was one of the only Caucasian LPNs on her assigned work unit.

77.    Ms. Faku in particular, regularly showed overt hostility toward Plaintiff and was commonly more congenial toward Defendant's non-Caucasian employees.

78.    Plaintiff was discriminated against in employment based on her race when she was treated less favorably than similarly situated non-Caucasian LPNs and other co-workers at the Defendant's location, because they were not subjected to the aforementioned acts of discrimination, including without limitation:

79.    Examples of race discrimination include but are not limited to:

a.    Ms. Faku allowed RN Kama to work with bilateral wrist injuries sustained at the same time as Plaintiff's September 4, 2023, injury from a patient, when Ms. Faku would not allow Plaintiff to work under the same conditions with her wrist injury.

b.    On or about May 3, 2024, Kama just walked into Ms. Faku's office and they talked for a long period of time.  Conversely, Plaintiff had requested several times to speak with Ms. Faku and was told "I'm busy, I'll get back to you." She never did get back to Plaintiff and she didn't likewise advise Kama she was too busy.

80.    Defendant regularly treated Plaintiff less favorably than her non-Caucasian counterparts, ultimately terminating her from their employ.

81.    These actions were carried out by the Defendant with malice and ill will towards Plaintiff because of her being Caucasian.

82.    The intentional discriminatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

83.    As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, attorney's fees, and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT II**
**DISCRIMINATION BASED ON RACE**
**(Disparate Treatment)**
**Title 20 of the State Government Article**
**Maryland Annotated Code §20-606**

84.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

85.    Plaintiff was qualified and satisfactorily performing her duties as an LPN.

86.    Plaintiff was one of the only Caucasian LPNs on her assigned work unit.

87.    Ms. Faku in particular, regularly showed overt hostility toward Plaintiff and was commonly more congenial toward Defendant's non-Caucasian employees.

88.    Plaintiff was discriminated against in employment based on her race when she was treated less favorably than similarly situated non-Caucasian LPNs and other co-workers at the Defendant's location, because they were not subjected to the aforementioned acts of discrimination, including without limitation:

89.    Examples of race discrimination include but are not limited to:

    a.    Ms. Faku allowed RN Kama to work with bilateral wrist injuries sustained at the same time as Plaintiff's September 4, 2023, injury from a patient, when Ms. Faku would not allow Plaintiff to work under the same conditions with her wrist injury.

    b.    On or about May 3, 2024, Kama just walked into Ms. Faku's office and they talked for a long period of time.  Conversely, Plaintiff had requested several times to speak with Ms. Faku and was told "I'm busy, I'll get back to you." She never did get back to Plaintiff and she didn't likewise advise Kama she was too busy.

90.    Defendant regularly treated Plaintiff less favorably than her non-Caucasian counterparts, ultimately terminating her from their employ.

91.     These actions were carried out by the Defendant with malice and ill will towards Plaintiff because of her being Caucasian.

92.     The intentional discriminatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

93.     As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, attorney's fees, and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT III**
**DISCRIMINATION BASED ON DISABILITY**
**(Disparate Treatment)**
**Americans with Disabilities Act of 1990, as amended, ("ADA")**
**42 U.S.C. § 12101, *et seq.***

94.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

95.     Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of disability (asthma) in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* (hereinafter "ADA").

96.     Plaintiff's disability is asthma, which from time-to-time substantially limits her ability to perform certain major life activities, of which Defendant was notified.

97.     Regarding her disability, in or around June 2023 in an Occupational Health ("OH") visit prior to starting on unit at that same approximate time, Plaintiff advised OH of her need to an N-95 3M Aura 1870 Covid-19 mask, showing the mask to the OH nurse (name unknown, age approximately late 30's, no known disability). That OH nurse advised Plaintiff that it was Ms. Faku's responsibility to order Plaintiff's masks, and to continue ordering the masks as necessary and that Plaintiff did not have to pay to supply them.

98.     Plaintiff however, had to use her own mask that she had purchased, for months. She continuously asked Ms. Faku, in person and by email specifically requesting that Ms. Faku order them but Plaintiff's requests were ignored.  She went to Ms. Faku on several occasions and on one of those occasions, Ms. Faku said:  "I have no idea what Occupational Health is talking about, why would I order them?"  Plaintiff continued to ask Ms. Faku to please get in touch with OH as that's what they had told Plaintiff before she ever started on the unit.  Plaintiff also advised Ms. Faku that she could not afford to pay for her own N-95 3M Aura 1870 Covid-19 masks.

99.     From approximately June through July 2023, Plaintiff went to Ms. Moreland because Ms. Faku would not meet with her regarding the needed mask.

100.    However, upon information and belief, nobody at the Defendant's location ever started working on this until after Plaintiff returned from an injury.

101.    On September 4, 2023, Plaintiff was injured by a combative patient.  Plaintiff's injury was to her left shoulder and wrist.

102.    Plaintiff filed a Workers Compensation  ("WC") claim after this September 4, 2023, injury, shortly thereafter, in September 2023.

103.    After Plaintiff returned to work after the September 2023 injury and had been working for approximately two weeks, she was injured by another patient on May 14, 2024, and sustained a torn rotator cuff injury to her right shoulder when patient became combative. Security was called twice but Plaintiff was already injured by the time they arrived.  This injury was such that Plaintiff has been advised to undergo surgery.

104.    After this May 2024, injury, a subsequent Workers Compensation claim was filed.

105.     Defendant was aware at all times herein of Plaintiff's disability and on-the-job injuries.

106.     Another example of disability discrimination was the repeated denial of her reasonable request for the accommodation of being assigned to light duty after her on-the-job injury of September 2023.

107.     The above acts and practices of the Defendant constitute unlawful discriminatory employment practices within the meaning of the ADA.

108.     The Defendant's acts were carried out with malice and reckless disregard for Plaintiff's protected civil rights.

109.     As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT IV**
**DISCRIMINATION BASED ON DISABILITY**
**(Disparate Treatment)**
**Title 20 of the State Government Article**
**Maryland Annotated Code §20-606**

110.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

111.     Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of disability (asthma) in violation of Title 20, §20-606 of the Maryland State Government Article (hereinafter "Title 20").

112.     Plaintiff's disability is asthma, which from time-to-time substantially limits her ability to perform certain major life activities, of which Defendant was notified.

113.    Regarding her disability, in or around June 2023 in an Occupational Health ("OH") visit prior to starting on unit at that same approximate time, Plaintiff advised OH of her need to an N-95 3M Aura 1870 Covid-19 mask, showing the mask to the OH nurse (name unknown, age approximately late 30's, no known disability).  That OH nurse advised Plaintiff that it was Ms. Faku's responsibility to order Plaintiff's masks, and to continue ordering the masks as necessary and that Plaintiff did not have to pay to supply them.

114.    Plaintiff however, had to use her own mask that she had purchased, for months. She continuously asked Ms. Faku, in person and by email specifically requesting that Ms. Faku order them but Plaintiff's requests were ignored.  She went to Ms. Faku on several occasions and on one of those occasions, Ms. Faku said:  "I have no idea what Occupational Health is talking about, why would I order them?"  Plaintiff continued to ask Ms. Faku to please get in touch with OH as that's what they had told Plaintiff before she ever started on the unit.  Plaintiff also advised Ms. Faku that she could not afford to pay for her own N-95 3M Aura 1870 Covid-19 masks.

115.    From approximately June through July 2023, Plaintiff went to Ms. Moreland because Ms. Faku would not meet with her regarding the needed mask.

116.    However, upon information and belief, nobody at the Defendant's location ever started working on this until after Plaintiff returned from an injury.

117.    On September 4, 2023, Plaintiff was injured by a combative patient.  Plaintiff's injury was to her left shoulder and wrist.

118.    Plaintiff filed a Workers Compensation  ("WC") claim after this September 4, 2023, injury, shortly thereafter, in September 2023.

119.     After Plaintiff returned to work after the September 2023 injury and had been working for approximately two weeks, she was injured by another patient on May 14, 2024, and sustained a torn rotator cuff injury to her right shoulder when patient became combative. Security was called twice but Plaintiff was already injured by the time they arrived.  This injury was such that Plaintiff has been advised to undergo surgery.

120.     After this May 2024, injury, a subsequent Workers Compensation claim was filed.

121.     Defendant was aware at all times herein of Plaintiff's disability and on-the-job injuries.

122.     Defendant was aware at all times herein of Plaintiff's disability.

123.     Another example of disability discrimination was the repeated denial of her requested light duty accommodation after on-the-job injury of September 2023.

124.     The above acts and practices of the Defendant constitute unlawful discriminatory employment practices within the meaning of Title 20.

125.     The Defendant's acts were carried out with malice and reckless disregard for Plaintiff's protected civil rights.

126.     As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT V**
**DISCRIMINATION BASED ON DISABILITY**
**(Disparate Treatment)**
**The Rehabilitation Act of 1973 ("Rehab Act")**
**Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq*.**

127.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

21

128.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq*., expressly prohibits employers from discriminating against qualified individuals with disabilities.

129.    Section 504 of the Rehabilitation Act is applicable to all entities that receive federal financial assistance. Upon information and belief, Hopkins receives federal monies through the National Institutes of Health and grants from time-to-time through U.S. Agency for International Development (USAID).

130.    The intentional discriminatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights because of his being a disabled person. Defendant deliberately set Plaintiff up for termination.

131.    The discriminatory actions of Defendant as set forth above, have caused and will continue to cause Plaintiff to suffer lost earnings and earning capacity, severe emotional distress, humiliation and mental anguish.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

## COUNT VI
## DISABILITY DISCRIMINATION
### (Failure To Engage in An Interactive Process)
### Americans with Disabilities Act of 1990, as amended,
### 42 U.S.C. § 12101, *et seq.*

132.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

133.    Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of interference with Plaintiff's medical accommodations in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. (hereinafter "ADA").

134.    Plaintiff's disability is asthma, which from time-to-time substantially limits her ability to perform certain major life activities, of which Defendant was notified.

135.     Regarding her disability, in or around June 2023 in an Occupational Health ("OH") visit prior to starting on unit at that same approximate time, Plaintiff advised OH of her need to an N-95 3M Aura 1870 Covid-19 mask, showing the mask to the OH nurse (name unknown, age approximately late 30's, no known disability).  That OH nurse advised Plaintiff that it was Ms. Faku's responsibility to order Plaintiff's masks, and to continue ordering the masks as necessary and that Plaintiff did not have to pay to supply them.

136.     Plaintiff however, had to use her own mask that she had purchased, for months. She continuously asked Ms. Faku, in person and by email specifically requesting that Ms. Faku order them but Plaintiff's requests were ignored.  She went to Ms. Faku on several occasions and on one of those occasions, Ms. Faku said:  "I have no idea what Occupational Health is talking about, why would I order them?"  Plaintiff continued to ask Ms. Faku to please get in touch with OH as that's what they had told Plaintiff before she ever started on the unit.  Plaintiff also advised Ms. Faku that she could not afford to pay for her own N-95 3M Aura 1870 Covid-19 masks.

137.     From approximately June through July 2023, Plaintiff went to Ms. Moreland because Ms. Faku would not meet with her regarding the needed mask.

138.     However, upon information and belief, nobody at the Defendant's location ever started working on this until after Plaintiff returned from the September 4, 2023, injury.

139.     Further, after Plaintiff's May 14, 2024, injury, she repeatedly requested the reasonable accommodation of light duty, which request was denied over and over.

140.     Rather than engaging in an interactive process with Plaintiff, Defendant took subsequent adverse employment actions against her, first ignoring her requests for light duty and then culminating in her wrongful termination.

141.     The above acts and practices of the Defendant constitute unlawful discriminatory employment practices within the meaning of the ADA.

142.     The Defendant's acts were carried out with malice and reckless disregard for Plaintiff's protected civil rights.

143.     As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT VII**
**DISABILITY DISCRIMINATION**
**(Interference with Reasonable Accommodation)**
**Title 20 of the State Government Article**
**Maryland Annotated Code § 20-606**

144.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

145.     Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of interference with Plaintiff's medical accommodations in violation of Title 20, §20-606 of the Maryland State Government Article (hereinafter "Title 20").

146.     Plaintiff's disability is asthma, which from time-to-time substantially limits her ability to perform certain major life activities, of which Defendant was notified.

147.     Regarding her disability, in or around June 2023 in an Occupational Health ("OH") visit prior to starting on unit at that same approximate time, Plaintiff advised OH of her need to an N-95 3M Aura 1870 Covid-19 mask, showing the mask to the OH nurse (name unknown, age approximately late 30's, no known disability).  That OH nurse advised Plaintiff that it was Ms. Faku's responsibility to order Plaintiff's masks, and to continue ordering the masks as necessary and that Plaintiff did not have to pay to supply them.

148.     Plaintiff however, had to use her own mask that she had purchased, for months. She continuously asked Ms. Faku, in person and by email specifically requesting that Ms. Faku order them but Plaintiff's requests were ignored.  She went to Ms. Faku on several occasions and on one of those occasions, Ms. Faku said:  "I have no idea what Occupational Health is talking about, why would I order them?"  Plaintiff continued to ask Ms. Faku to please get in touch with OH as that's what they had told Plaintiff before she ever started on the unit.  Plaintiff also advised Ms. Faku that she could not afford to pay for her own N-95 3M Aura 1870 Covid-19 masks.

149.     From approximately June through July 2023, Plaintiff went to Ms. Moreland because Ms. Faku would not meet with her regarding the needed mask.

150.     However, upon information and belief, nobody at the Defendant's location ever started working on this until after Plaintiff returned from the September 4, 2023, injury.

151.     Further, after Plaintiff's May 14, 2024, injury, she repeatedly requested the reasonable accommodation of light duty, which request was denied over and over.

152.      The above acts and practices of the Defendant constitute unlawful discriminatory employment practices within the meaning of Title 20.

153.     The Defendant's acts were carried out with malice and reckless disregard for Plaintiff's protected civil rights.

154.     As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

## COUNT VIII
## AGE DISCRIMINATION
### Age Discrimination in Employment Act
### ("ADEA") as amended
### 29 U.S.C. § 621, *et seq*.

155.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

156.    Plaintiff was an employee of Defendant.

157.    Plaintiff was a member of a protected class, over 40 years old, YOB: 1967, throughout the time of the subject discriminatory acts.

158.    Defendant was aware of Plaintiff's age at all relevant times.

159.    Plaintiff was satisfactorily performed her duties as LPN during her employment with the Defendant.

160.    Plaintiff alleges that she experienced less favorable treatment than employees of Defendant with similar positions due to her age.

161.    Specifically, Plaintiff alleges that younger employees at Defendant's facilities, such as described hereinabove, were treated more favorably than Plaintiff, and were not subjected to similar adverse employment actions.

162.    Examples of age discrimination include but are not limited to:

a.    Victoria Hoyos, an RN (upon information and belief in her mid-20's, "Ms. Hoyos") on or about July 2023, was overheard by Plaintiff, talking to Ms. Faku about her (Plaintiff), neither knew that Plaintiff was within hearing distance. Plaintiff was waiting for Ms. Hoyos and at first, couldn't find her.  Plaintiff needed Ms. Hoyos to with her into a patient's room.  As Plaintiff approached near the nurse station, Ms. Hoyos said to Ms. Faku, "Christina is too old to be doing this job, she can't keep up with me on the floor.  I feel like she's an anchor weighing me down, and I move quickly.  Can you put

her with someone else?"  Ms. Faku replied, "yeah, I think she's like 50ish, or something. She already came to me wanting me to assign her to someone else because you won't let her do anything"  Plaintiff had already complained to Ms. Faku several times and requested a new preceptor because Ms. Hoyos would not allow Plaintiff to do much of anything, just follow her around all day.  Plaintiff felt that Ms. Hoyos was fast, but simply erratic and the fact is that Ms. Hoyos got fired later.

      b.     In conversation with Kama, Plaintiff learned that one reason she (Kama) kept working with injuries was 'because Hopkins wants these young nurses, hospitalists, and techs, it's what they're hiring now'.

      c.     Educator Jennifer Moreland (early 30s, pregnant during the time Plaintiff was employed by Hopkins, "Ms. Moreland") allowed a new RN (approximately early 20s, Hispanic, name unknown at this time) who had never learned IV's or blood draws in school but was allowed to work with people and in IV therapy class.  This 20-something RN told Plaintiff that Ms. Moreland sent her (to work with people and to the IV therapy class). She also told Plaintiff that others got to go work on floor with surgery to gain IV experience. Ms. Moreland would never allow Plaintiff to do any of that, in spite of her many requests, nor would Ms. Faku. The above acts and practices of the Defendant constitute unlawful discriminatory employment practices within the meaning of ADEA.

163.    The Defendant's acts were carried out with malice and reckless disregard for Plaintiff's protected civil rights.

164.    As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT IX**
**AGE DISCRIMINATION**
**Title 20 of the State Government Article**
**Maryland Annotated Code § 20-606**

165.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

166.    Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of age in violation of Title 20, §20-606 of the Maryland State Government Article (hereinafter "Title 20").

167.    Plaintiff was a member of a protected class, over 40 years old, YOB: 1967, throughout the time of the subject discriminatory acts.

168.    Defendant was aware of Plaintiff's age at all relevant times.

169.    Plaintiff was satisfactorily performed her duties as LPN during her employment with the Defendant.

170.    Plaintiff alleges that she experienced less favorable treatment than employees of Defendant with similar positions due to her age.

171.    Examples of age discrimination include but are not limited to:

a.    Victoria Hoyos, an RN (upon information and belief in her mid-20's, "Ms. Hoyos") on or about July 2023, was overheard by Plaintiff, talking to Ms. Faku about her (Plaintiff), neither knew that Plaintiff was within hearing distance. Plaintiff was waiting for Ms. Hoyos and at first, couldn't find her.  Plaintiff needed Ms. Hoyos to with her into a patient's room.  As Plaintiff approached near the nurse station, Ms. Hoyos said to Ms. Faku, "Christina is too old to be doing this job, she can't keep up with me on the floor.  I feel like she's an anchor weighing me down, and I move quickly.  Can you put her with someone else?"  Ms. Faku replied, "yeah, I think she's like 50ish, or something.

She already came to me wanting me to assign her to someone else because you won't let her do anything" Plaintiff had already complained to Ms. Faku several times and requested a new preceptor because Ms. Hoyos would not allow Plaintiff to do much of anything, just follow her around all day. Plaintiff felt that Ms. Hoyos was fast, but simply erratic and the fact is that Ms. Hoyos got fired later.

  b. In conversation with Kama, Plaintiff learned that one reason she (Kama) kept working with injuries was 'because Hopkins wants these young nurses, hospitalists, and techs, it's what they're hiring now'.

  c. Educator Jennifer Moreland (early 30s, pregnant during the time Plaintiff was employed by Hopkins, "Ms. Moreland") allowed a new RN (approximately early 20s, Hispanic, name unknown at this time) who had never learned IV's or blood draws in school but was allowed to work with people and in IV therapy class. This 20-something RN told Plaintiff that Ms. Moreland sent her (to work with people and to the IV therapy class). She also told Plaintiff that others got to go work on floor with surgery to gain IV experience. Ms. Moreland would never allow Plaintiff to do any of that, in spite of her many requests, nor would Ms. Faku. The above acts and practices of the Defendant constitute unlawful discriminatory employment practices within the meaning of Title 20.

172. The Defendant's acts were carried out with malice and reckless disregard for Plaintiff's protected civil rights.

173. As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

  WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT X**
**RETALIATION**
**(Adverse Actions, Protected Activity Deterrents and Termination)**
**Title VII of the Civil Rights Act of 1964 (Title VII)**
**42  U.S.C. § 2000e,** ***et seq.***

174.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

175.    Plaintiff engaged in protected activity when she complained about discrimination and harassment based on race, age, disability and Defendant's interference with medical accommodations.

176.    In retaliation for Plaintiff's complaints regarding disparate treatment, Defendant failed to address Plaintiff's continued requests that Defendant cease, address and correct these discriminatory acts and practices and Defendant continued to engage with such acts and practices.

177.    There is a causal connection between Plaintiff's complaints and the materially adverse actions and disparate treatment taken against Plaintiff by Defendant.

178.    The retaliation endured by the Plaintiff would dissuade a reasonable employee from making complaints of discrimination, harassment and interference with medical accommodations.

179.    Defendant retaliated against the Plaintiff for engaging in protected activity in violation of Title VII.

180.    As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT XI**
**RETALIATION**
**(Adverse Actions, Protected Activity Deterrents and Termination)**
**Title 20 of the State Government Article**
**Maryland Annotated Code § 20-606(f)**

181.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

182.    Plaintiff engaged in protected activity when she complained about discrimination and harassment based on race, age, disability and Defendant's interference with medical accommodations.

183.    In retaliation for Plaintiff's complaints regarding disparate treatment, Defendant failed to address Plaintiff's continued requests that Defendant cease, address and correct these discriminatory acts and practices and Defendant continued to engage with such acts and practices.

184.    There is a causal connection between Plaintiff's complaints and the materially adverse actions and disparate treatment taken against Plaintiff by Defendant.

185.    The retaliation endured by the Plaintiff would dissuade a reasonable employee from making complaints of discrimination, harassment and interference with medical accommodations.

186.    Defendant retaliated against the Plaintiff for engaging in protected activity in violation of Md. Ann. Code., State Gov't, §20-606(f), *et seq.*

187.    As a direct and proximate result of the Defendant's discriminatory actions, Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

## COUNT XII
## RETALIATION
### (Adverse Actions, Protected Activity Deterrents and Termination)
### Maryland Labor & Employment Code Ann. § 9-1105(a)

188.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

189.     Maryland Labor and Employment Code protects employees who file Workers

Compensation claims, stating in relevant part:

> An employer may not discharge a covered employee from
> employment solely because the covered employee files a claim for
> compensation under this title.

190.     Plaintiff engaged in protected activity when she pursued her two claims for

Workers Compensation (injuries of September 4, 2023, and May 14, 2024).

191.     In retaliation for Plaintiff's filing of two Workers Compensation claims,

Defendant first cleared her to return to work against her own doctors' orders (after the 2023

injury), then demoted her, and then terminated her while she was on a second, approved medical

leave (related to the 2024 injury).

192.     There is a causal connection between Plaintiff's Workers Compensation claims

and the materially adverse actions and disparate treatment taken against Plaintiff by Defendant.

193.     The retaliation endured by the Plaintiff would dissuade a reasonable employee

from filing Workers Compensation claims.

194.     Defendant retaliated against the Plaintiff for engaging in protected activity in

violation of Md. Ann. Code., State Gov't, §20-606(f), *et seq.*

195.     As a direct and proximate result of the Defendant's discriminatory actions,

Plaintiff has suffered lost wages and emotional distress, and incurred attorney's fees and

litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**COUNT XIII**
**WRONGFUL DISCHARGE/PUBLIC POLICY**
**(Disparate Treatment Based on Age)**
**Title 20 of the State Government Article**
**Maryland Annotated Code § 20-602**

196.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

197.    Maryland Code, State Government, §20-602 states that it is the public policy of the State to prohibit age discrimination "to assure all persons equal opportunity in receiving employment and in all labor management-union relations, regardless of … age…."

198.    Plaintiff's date of birth is March 3, 1967 and she is thereby a member of a protected group of individuals over the age of forty (40).

199.    Throughout all times mentioned herein, Plaintiff was qualified and satisfactorily performing her duties as a Licensed Practical Nurse.

200.    Plaintiff was the victim of intentional discrimination based on her age, as detailed in Paragraphs 18a through 18c above.

201.    Defendant further discriminated against Plaintiff based on her age, when they summarily dismissed her from their employ while she was still on out approved medical leave.

202.    Plaintiff's discharge falls under Maryland's public policy exception to the at-will employment doctrine.

203.    The intentional discriminatory actions complained of above were done with malice and/or with reckless indifference to Plaintiff's rights.

204.    As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered lost wages and benefits, emotional distress, attorney's fees, and litigation costs.

WHEREFORE, Plaintiff prays for relief as more fully set forth below.

**PRAYER FOR DAMAGES**

WHEREFORE, for the foregoing reasons, Christina Vaccaro, Plaintiff, demands

judgment against The Johns Hopkins Health System Corporation, Defendant, as follows:

1.    Compensatory damages in excess of $75,000.00;

2.    Punitive damages in excess of $75,000.00;

3.    Clean Personnel Record;

4.    Prejudgment and post judgment interest;

5.    Award attorney's fees and costs, including expert witness fees, as allowed by law;

6.    Award past and future economic damages for all claims as allowed by law, in an

amount to be determined at trial, including, but not limited to, back pay and lost benefits,

COBRA payments incurred by Plaintiff, front pay, and special damages comprised in part of, but

not limited to, past and future costs of borrowing funds to meet financial obligations, and past

and future out-of-pocket pecuniary losses;

7.    Award past and future non-economic damages for all claims as allowed by law, in

an amount to be determined at trial, including, but not limited to, lost earnings capacity, mental

suffering, emotional distress, loss of enjoyment of life, humiliation, loss of reputation, and

inconvenience;

8.    And for such other and further relief as this Honorable Court deems just and equitable.

Dated:  February 15, 2026          Respectfully submitted,

*Paul V. Bennett*
_____
Paul V. Bennett, Esq.
AIS 9207270001
Bennett Legal Services, Inc.
5457 Twin Knolls Road, Suite 300
Columbia, MD  21045
(410) 353-4994
Email: pbennett@bennettlaw.net
*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Christina Vaccaro, Plaintiff, hereby demands that this matter be tried by jury.

*Paul V. Bennett*

Dated:  February 15, 2026     _____
Paul V. Bennett, Esq.